Maria–Kelly F. YNIGUEZ;  Jaime P. Gutierrez, Plaintiffs,

v.

STATE OF ARIZONA, Defendant–Appellee.

Robert D. Parks;  Arizonans for Official English, Applicants in intervention-Appellants.

Maria–Kelly F. YNIGUEZ;  Jaime P. Gutierrez, Plaintiffs–Appellees,

v.

Rose MOFFORD, individually and as Governor of the State of Arizona; Robert Corbin, individually and as Attorney General of the State of Arizona, Defendants–Appellants.

Robert D. Parks;  Arizonans for Official English, Applicants in intervention-Appellees.

Nos. 90–15546, 90–15581.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 14, 1990.

Decided July 19, 1991.

Robert K. Corbin, Atty. Gen., Anthony B. Ching, Sol. Gen., Paula S. Bickett, Asst. Atty. Gen., Phoenix, Ariz., for state appellants.

Robert J. Pohlman, Pohlman & Sanders, Phoenix, Ariz., for plaintiffs-appellees.

Barnaby W. Zall, Williams & Jensen, Washington, D.C., for the appellant, movants & intervenors.

James F. Henderson, Gust, Rosenfeld & Henderson, Phoenix, Ariz., for the appellants, movants, intervenors.

Before TANG, FLETCHER and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

This case presents two novel questions concerning post-judgment intervention: first, whether the sponsors of a ballot initiative may intervene after judgment to appeal a decision holding the ballot initiative unconstitutional when the only defendant in the case chooses not to appeal; and second, whether the Attorney General, having argued for and won a dismissal of the suit against him in the district court, may intervene on appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

Arizonans for Official English ("AOE") and its spokesman Robert D. Park campaigned for adoption by ballot initiative of an amendment to the Arizona Constitution entitled "English as the Official Language." In the November 1988 general election, the Arizona voters approved the new constitutional provision. That new provision, Article XXVIII of the Arizona Constitution ("Article XXVIII") provides in part:

English shall be the official language of the State of Arizona and all of its political subdivisions, that the Article is applicable to all branches of government and to all government officials and employees during the performance of government business, that the state and its political subdivisions shall take all reasonable steps to preserve, protect and enhance the role of English as the state's official language, that the state and its political subdivisions ... shall act only in English....

Section Four of Article XXVIII states that "[a] person who resides in or does business in this State shall have standing to bring suit to enforce this Article in a court of record of the State. The Legislature may enact reasonable limitations on the time and manner of bringing suit under this subsection." The Arizona legislature has not enacted any limitations on private lawsuits to enforce Article XXVIII.

Maria–Kelly Yniguez, an employee of the Arizona Department of Administration, ceased speaking Spanish while performing her official state duties immediately upon passage of Article XXVIII. She feared that under Article XXVIII she was vulnerable to discipline by her state employer if she were to continue to speak Spanish on the job. In November 1988 Yniguez sued (in a series of amended complaints) the State of Arizona, Governor Rose Mofford, Arizona Attorney General Robert Corbin, and Director of the Arizona Department of Administration Catherine Eden in federal district court. Yniguez sought an injunction against state enforcement of Article XXVIII and a declaration that it violates the first and fourteenth amendments of the United States Constitution.

The state defendants all moved for dismissal, arguing that the eleventh amendment barred Yniguez's suit and that there was no live "case or controversy," U.S. Const. art. III, between Yniguez and any of the defendants. All of the state defendants were represented by the Attorney General's office. The district court then proceeded to issue a series of thoughtful and carefully reasoned rulings, most of which are not now before us.

On February 6, 1990, the district court dismissed all defendants from the suit except the Governor. The court held that the eleventh amendment bars suit against Arizona. The court further held that the Attorney General is an improper party under the doctrine of *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), because he has no authority to enforce Article XXVIII against Yniguez. Therefore, the court held that the eleventh amendment also bars Yniguez's suit against the

Attorney General. Although the district court found that Eden has authority to enforce Article XXVIII, she had not threatened to do so, and thus the court held that no case or controversy was ripe for adjudication as to her. The district court therefore dismissed Eden from the suit as well. Finally, the district court held that the Governor has the authority to enforce Article XXVIII against Yniguez and had sufficiently threatened to do so for Yniguez to sue her under *Ex parte Young.*

Having dismissed all the defendants except the Governor, the district court proceeded on the same date, February 6, 1990, to rule on the merits of Yniguez's claim. The court held that Article XXVIII is facially unconstitutional under the first amendment. It therefore granted Yniguez declaratory relief, but denied injunctive relief because there was no enforcement action pending. Governor Mofford—who had publicly opposed the adoption of Article XXVIII during the 1988 election—immediately announced her decision not to appeal the district court's opinion and order.

On February 16, 1990, AOE and its spokesperson Park moved to intervene post-judgment for the purpose of pursuing an appeal of the district court's order. They sought to intervene both as of right and permissively under Fed.R.Civ.P. 24. During arguments before the district court and this court, the attorneys for the Attorney General's office and for AOE and Park averred that AOE had inquired of the Attorney General at an early stage of the lawsuit whether he would vigorously defend the constitutionality of Article XXVIII, and that they had been assured that he

would. Yniguez does not contend otherwise. On March 2, 1990, the Attorney General sought to intervene for the purpose of prosecuting the appeal pursuant to 28 U.S.C. § 2403(b).

On April 3, 1990, the district court denied both motions to intervene. 130 F.R.D. 410. Although the court found that AOE's and Park's motion was timely, it denied it on two grounds. First, the court held that the prospective intervenors did not satisfy the Article III requirement of injury-in-fact necessary for there to be a justiciable controversy. In addition, the court denied the motion to intervene as of right on the ground that AOE and Park did not have an adequate interest in the litigation under Fed.R.Civ.P. 24(a)(2). The district court stated that its decision on the merits would not bind the Arizona courts, and therefore that AOE's and Park's ability to enforce Article XXVIII was not impaired by the decision.[1] The district court also denied the Attorney General's motion to intervene under 28 U.S.C. § 2403(b). Section 2403(b) authorizes intervention by a state attorney general in actions "to which [the] State or any agency, officer, or employee thereof is not a party." The district court noted that although the Governor had not appealed, she remained a party. Accordingly, the court concluded that section 2403(b) is not applicable. These timely appeals of the denial of the motions to intervene followed.

## STANDARD OF REVIEW

We review de novo the denial of a motion to intervene. *Waller v. Financial Corp. of America*, 828 F.2d 579, 582 (9th Cir.1987). The district court's determina-

---

**1.** In its written memorandum opinion and order denying the post-judgment intervention motion, the district court indicated that the reason its opinion on the merits would have no *stare decisis* effect in the Arizona courts was because the decision rested on an interpretation of state law. The district court cited *Moore v. Sims,* 442 U.S. 415, 428, 99 S.Ct. 2371, 2379, 60 L.Ed.2d 994 (1979) and *Blake v. Pallan,* 554 F.2d 947, 954 (9th Cir.1977), both of which recite the familiar principle that state courts have the final word on the meaning of state law. A state court may avoid a federal court decision striking down a provision of state law by giving that provision an appropriate narrowing construc-

tion. All of this is unexceptional. However, during oral argument on the post-judgment intervention motion the district court expressed a more sweeping view on the power of state courts to ignore federal decisions not just about state law, but federal law. The district court suggested that even if the Arizona state courts were to interpret Article XXVIII exactly as the federal court had interpreted it, the Arizona courts would not be bound to follow the federal court decision that it is unconstitutional, because only decisions of the United States Supreme Court can bind the states on questions of federal law. We address this view below, *infra* at 737.

tion of timeliness, however, is reviewed only for an abuse of discretion. *County of Orange v. Air California,* 799 F.2d 535, 537 (9th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## DISCUSSION

### I. AOE and Park

■ AOE and Park contend that they have a right to intervene on appeal under Fed.R.Civ.P. 24(a) ("Intervention of Right"). Rule 24 of the Federal Rules of Civil Procedure confers a right to intervene "[u]pon timely application" when:

> the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a)(2). In *Sagebrush Rebellion, Inc. v. Watt,* 713 F.2d 525 (9th Cir. 1983), we interpreted Rule 24(a) to require the granting of a motion to intervene at the outset of litigation if four criteria are met: (1) timeliness; (2) an interest in the subject matter of the litigation; (3) absent intervention the party's interest may be practically impaired; (4) other parties inadequately represent the intervenor. *Id.* at 527.

■ In order for an individual to intervene in ongoing litigation between other parties, he need only meet the *Sagebrush Rebellion* criteria. However, where no party appeals, the "case or controversy" requirement of Article III also qualifies an applicant's right to intervene post-judgment. In *Legal Aid Soc'y. of Alameda County v. Brennan,* 608 F.2d 1319 (9th Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980), we restated the rule that "post-judgment intervention for purposes of appeal may be appropriate if the intervenors ... meet traditional standing criteria." *Id.* at 1328 (citations omitted). As the Supreme Court stated in *Diamond v. Charles,* 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986),

"[a]lthough intervenors are considered parties entitled, among other things, to seek review ... an intervenor's right to continue a suit in the absence of the party on whose side intervention was permitted is *contingent upon a showing by the intervenor that he fulfills the requirements of Art. III.*" *Id.* at 68, 106 S.Ct. at 1706 (citation omitted; emphasis added). This requirement assures the jurisdictional prerequisite of a live "case or controversy."

■ As we explained in *Brennan,* once the party defendants have "acquiesced in the judgment against them," as the Governor did here, applicants "must demonstrate such a stake in the outcome of an appeal that a live Article III case or controversy remains for appellate resolution." *Brennan,* 608 F.2d at 1328 n. 6. Therefore, an interest strong enough to permit intervention with parties at the onset of an action under Rule 24(a) is not necessarily a sufficient basis for intervention after judgment for the purpose of pursuing an appeal which all parties have abandoned. In *Brennan* we cited a commentator to illustrate this jurisdictional limitation:

> A distinction between standing to intervene and to appeal makes particular sense when the "case or controversy" limitation on the federal judicial power is recalled. Adding C to the litigation between A and B may pose no problems under Article III of the Constitution, but permitting C to be the sole adversary of B on appeal, when his interest in the case may be only in its value as precedent, certainly does give difficulty since there is no real controversy between A and C.

Shapiro, *Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators,* 81 Harv.L.Rev. 721, 753–54 (1968) (cited with approval in *Brennan,* 608 F.2d at 1328 n. 9). Hence, before assessing whether AOE and Park meet the *Sagebrush Rebellion* criteria, we must first decide whether permitting them to intervene on appeal would be consistent with the requirements of Article III.

### A. *Article III Standing*

■ AOE and Park can meet the Article III "standing criteria by alleging a threat

of particularized injury from the order they seek to reverse that would be avoided or redressed if their appeal succeeds." *Brennan*, 608 F.2d at 1328. AOE and Park contend, as they did in the district court, that they satisfy this test because, as the sponsors of Article XXVIII, they will be injured by its nullification. The district court held that this "abstract" interest is insufficiently concrete to satisfy Article III. Yniguez urges us to adopt the district court's reasoning, citing *Diamond v. Charles.*

In *Diamond*, a private physician had intervened at the trial level in an action to enjoin enforcement of an Illinois statute restricting the performance of abortions. After the Court of Appeals affirmed a permanent injunction against the enforcement of the statute, the state decided not to appeal. The private physician, claiming that he had an interest in seeing Illinois' laws enforced, attempted to appeal to the United States Supreme Court. The Court held that he lacked standing because although he had "an interest" he lacked a "direct stake [ ] in the abortion process." 476 U.S. at 66, 106 S.Ct. at 1706.

From *Diamond*, Yniguez would have us conclude that a mere "philosophical interest in the outcome of litigation is insufficient to confer a right to appeal." While we agree with this statement, we reject the suggestion that AOE and Park are mere " 'concerned bystanders,' who will use [the appeal] simply as a 'vehicle for the vindication of value interests.' " *Diamond*, 476 U.S. at 62, 106 S.Ct. at 1703 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 740, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972); *United States v. SCRAP*, 412 U.S. 669, 687, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973)). We find that AOE's and Park's interest in Article XXVIII is qualitatively distinct from the physician's interest in the Illinois abortion law at issue in *Diamond.*

Unlike the physician, neither AOE nor Park is a mere "private citizen." 476 U.S. at 64, 106 S.Ct. at 1704. As the principal sponsors of Article XXVIII, their relationship to Article XXVIII is closely analogous to the relationship of a state legislature to a state statute. It is therefore useful to consider the law of legislative standing.

In *Karcher v. May*, 484 U.S. 72, 108 S.Ct. 388, 98 L.Ed.2d 327 (1987), the Supreme Court held that state legislators who intervened in their official capacities to defend a lawsuit challenging the constitutionality of a statute that had been enacted over the Governor's veto did not have standing once they were out of office. But in arriving at that decision, the Court clearly indicated that jurisdiction had been proper in the district court and the court of appeals so long as the legislators held office, notwithstanding the fact that the Attorney General had declined to defend the suit. *See id.* at 72–73, 108 S.Ct. at 390–91. As Justice White pointed out in his concurrence in the judgment, by allowing the legislators to intervene to defend the suit when the state executive did not wish to assert the statute's constitutionality, the Court "acknowledged that the New Jersey Legislature and its authorized representative have the authority to defend the constitutionality of a statute attacked in federal court." *Id.* at 84–85, 108 S.Ct. at 396. Furthermore, as the Court recognized over a half century ago, state legislators claiming that their votes "have been overridden and virtually held for naught" by an Executive decision have a sufficient stake in the outcome under Article III to vindicate their interests in federal court. *Coleman v. Miller*, 307 U.S. 433, 438, 59 S.Ct. 972, 975, 83 L.Ed. 1385 (1939) (holding that 20 state senators who voted against ratification of a federal constitutional amendment had standing to challenge the state lieutenant governor's legal authority to cast the deciding vote in favor of the amendment).[2]

**2.** Also relevant in this regard is *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). In a section of the opinion in that case captioned "Case or Controversy" the Court stated that where the Executive Branch agreed with Chadha that the challenged statute was unconstitutional, Congress' defense of the statute on

appeal guaranteed the "concrete adverseness" required by Article III. *Id.* at 939, 103 S.Ct. at 2778. The Court summarized its prior cases thus: "We have long held that Congress is the proper party to defend the validity of a statute when an agency of government, as a defendant charged with enforcing the statute, agrees with

It is therefore clear that were Article XXVIII a statute rather than a ballot initiative, the Arizona legislature would have standing to · defend its constitutionality.[3] AOE argues that as the principal sponsor of the initiative, it stands in an analogous position to a state legislature. We agree. The official sponsors of a ballot initiative have a strong interest in the vitality of a provision of the state constitution which they proposed and for which they vigorously campaigned. The district court's decision striking down Article XXVIII essentially nullified the considerable efforts AOE made to have the initiative placed on the ballot and to obtain its passage. *Cf. Coleman v. Miller, supra,* p. 439, 59 S.Ct. p. 975.

Arizona law recognizes the ballot initiative sponsor's heightened interest in the measure by giving the sponsor official rights and duties distinct from those of the voters at large. *See, e.g.,* Ariz.Rev.Stat. Ann. § 19–111 ("person or organization intending to propose a law or constitutional amendment by petition" must file an application with the secretary of state); § 19–122 (if the secretary of state rejects a petition for a ballot initiative, he must provide the sponsor with a written statement of reasons for doing so); § 19–124 (sponsor may submit an argument in favor of the initiative at the time the application is filed).

Moreover, as appears to be true in this case, the government may be less than enthusiastic about the enforcement of a measure adopted by ballot initiative; for better or worse, the people generally resort to a ballot initiative precisely because they do not believe that the ordinary processes of representative government are sufficiently sensitive to the popular will with respect to a particular subject. While the people may not always be able to count on their elected representatives to support fully and fairly a provision enacted by ballot initiative, they can invariably depend on its sponsors to do so.

Finally, it is worth noting that there is a virtual *per se* rule that the sponsors of a ballot initiative have a sufficient interest in the subject matter of litigation concerning that initiative to intervene pursuant to Fed. R.Civ.P. 24(a). *See infra,* part I.B.2. While the interest required to intervene under the Rule is not identical to the interest required for standing under Article III, there are substantial similarities between the two. For the reasons we have already given, the added interest necessary to confer Article III standing—a particularized injury that distinguishes AOE from "concerned bystanders," *Diamond,* 476 U.S. at 62, 106 S.Ct. at 1703—is present here.

We conclude that AOE, as the sponsor of Article XXVIII, has standing to pursue the instant appeal.[4]

▉ Quite apart from our consideration of AOE's status as the sponsor of the initiative, we hold that Park, as an individual, has standing under the traditional Article III standards applicable to all private citizens. Yniguez argues that because the district court's decision has not "injured"

plaintiffs that the statute is inapplicable or unconstitutional." *Id.* at 940, 103 S.Ct. at 2778.
   Although the question whether *individual* members of Congress have standing to sue seeking enforcement of a federal law is an open one, *see Burke v. Barnes,* 479 U.S. 361, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987), the separation of powers issues raised by that question are not implicated in this case.

3. That the Supreme Court allowed legislative standing in the cases we have discussed shows that legislative standing is appropriate both under Article III and the prudential standing rules the Court has articulated. *See, e.g., Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1607–08, 60 L.Ed.2d 66 (1979).

4. We do not suggest that the government of Arizona does not also have a sufficient interest in the validity of a provision of the Arizona Constitution to satisfy Article III. Although we need not address the question whether the Attorney General has Article III standing to pursue the present appeal, *see infra* at 737 (holding that Attorney General is estopped from re-entering the case as a party), we may assume that whenever the constitutionality of a provision of state law is called into question, the state government will have a sufficient interest under Article III. We merely point out that in the case of a successful ballot initiative, its sponsor will also have a sufficient interest.

Park in a tangible way, the Article III standing requirements are not met. However, when we consider Park's standing as an individual the relevant question is not: has Yniguez injured Park? Rather, because Yniguez brought this case seeking declaratory and injunctive relief, the crucial question for determining whether there is an Article III case or controversy is instead: was there a more than speculative threat that Park was about to bring an action to enforce Article XXVIII against Yniguez? If so, then there was a sufficiently ripe case or controversy between Yniguez and Park to justify an action for declaratory relief. *See Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (federal declaratory relief is available "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a [provision of state law], and there exists a credible threat of prosecution thereunder...."); *Ripplinger v. Collins,* 868 F.2d 1043, 1047 (9th Cir.1989) (because of the risk of self-censorship, a reasonable fear of prosecution for the exercise of first amendment rights was shown where plaintiff alleged that sheriff had conducted preliminary investigation of his activities and others had been indicted for similar activities); *Polykoff v. Collins,* 816 F.2d 1326, 1331 (9th Cir.1987) (declaratory relief available because of the chilling effect of obscenity statute).

It is plain from the face of Article XXVII, that Park *could* have sued Yniguez to enforce it.[5] We must now determine whether there was a more than speculative threat that he *would* do so. As we have indicated, this is a question of ripeness.

Generally the ripeness question on appeal in a declaratory judgment case focuses on whether there was a ripe case or controversy when the suit was initiated. *See Ripplinger,* 868 F.2d at 1047 (discussing reasonableness of the plaintiff's fear of prosecution "at the time of filing [of the] lawsuit"). Because Park was not a party to the action below, the district court made no specific finding as to whether he had threatened to enforce Article XXVIII against Yniguez. However, the Attorney General has attested that Park and AOE did not intervene at an early stage in the proceedings only because they had been expressly assured by the Attorney General that he would vigorously represent their interests. Thus, we may treat AOE's and Park's assertion of their interests in the litigation to the Attorney General as an expression, at the time of the initiation of the proceedings, of their intention to see Article XXVIII enforced against Yniguez. At the outset of litigation, Yniguez therefore could have had a reasonable expectation that Park (and possibly AOE as well) would bring an enforcement action against her. As a result, the *United Farm Workers Nat'l Union* requirements are met.

We therefore hold that AOE and Park have standing to appeal.

## B. *The Sagebrush Rebellion Criteria*

■ We next consider the four criteria under Fed.R.Civ.P. 24(a) in turn.

### 1. Timeliness

The district court found that AOE's and Park's motion to intervene was timely. The court applied the general rule that a post-judgment motion to intervene is timely if filed within the time allowed for the filing of an appeal. However, the district court also considered whether the motion was timely in light of the fact that AOE and Park did not move to intervene until after the judgment. The district court noted that AOE's and Park's complaints about the adequacy of the Attorney General's

---

5. Section Four of Article XXVIII provides for enforcement actions by any "person who resides in or does business in this State." This clearly includes Park, as Yniguez admits. In her brief in this court, Yniguez states that "an action could be instituted by AOE and Park against Kelly Yniguez should they believe her actions violate Article XXVIII." We note that "person" may also include an organization such as AOE. However, because we hold that AOE has standing in the same way that a legislature might, we need not attempt to predict whether the courts of Arizona would entertain a suit brought by AOE to enforce Article XXVIII.

defense of Article XXVIII indicated that they should have intervened during the litigation. The court also noted that AOE and Park did not realize the supposed inadequacy of the Attorney General's defense until very late in the proceedings. The court further acknowledged that an early motion to intervene could have been futile because of the Attorney General's opposition to intervention and his assurances to AOE and Park that he would vigorously defend Article XXVIII. After considering all of these factors, the district court concluded that the motion was timely.

There is no contention that the time that elapsed between the judgment and AOE's and Park's motion was excessive. The only question here is whether AOE and Park should have attempted to intervene before the final judgment in the court below. Although, as the district court noted, the most prudent course for AOE and Park to have followed would have been to attempt to intervene as soon as they had doubts about the Attorney General's representation, we cannot fault them for relying on that official's assurance that he would defend Article XXVIII fully. Having received that assurance, AOE and Park were not required to monitor the litigation closely to see if the government was asserting a position which, if accepted, could prejudice their interests. Moreover, given the Attorney General's stated view that he would fully defend Article XXVIII, we doubt whether an early motion by AOE and Park to intervene would have been granted, especially if it had been opposed by the Attorney General. Thus, we cannot say that the district court abused its discretion by finding that their motion to intervene was timely.[6]

### 2. Interest in the Subject Matter of the Litigation

There appears to be a virtual *per se* rule that the sponsors of a ballot initiative have a sufficient interest in the subject matter

of the litigation to intervene pursuant to Fed.R.Civ.P. 24(a). As we stated in *Washington State Bldg. & Constr. Trades Council v. Spellman*, 684 F.2d 627, 630 (9th Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983), because "[r]ule 24 traditionally has received a liberal construction ... the public interest group that sponsored the initiative [is] entitled to intervention as a matter of right under Rule 24(a)." *Accord Sagebrush Rebellion*, 713 F.2d at 527–28. Moreover, because the Article III standing requirements are more stringent than those for intervention under rule 24(a), *see supra*, p. 731–32, our determination that AOE and Park have standing under Article III compels the conclusion that they have an adequate interest under the rule.

### 3. Practical Impairment Absent Intervention

Yniguez argues that AOE's and Park's interests are not impaired by the district court's decision because they retain the right to sue in state court to enforce Article XXVIII. Yniguez correctly notes that the district court's decision is not *res judicata* with respect to AOE and Park. As the Supreme Court has stated, "[i]t is a principle of general application in anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 2184, 104 L.Ed.2d 835 (1989) (quoting *Hansberry v. Lee*, 311 U.S. 32, 40, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940)). However, this principle is not dispositive, because the question here is whether the district court's decision will result in *practical* impairment of the interests of AOE and Park, not whether the decision itself binds them.

Yniguez next contends that the district court's judgment is no impediment to AOE

---

**6.** It is worth recalling that the district court dismissed all the defendants except the Governor at the same time that it decided the merits. Thus, AOE and Park were first alerted to the inadequacy of the state's representation of its

interests when the district court decided the merits. As we have stated, there is no contention that they did not act in a timely fashion after learning of that decision.

and Park because it is not a binding precedent on the state courts. All parties agree that it is not binding in the sense that the courts of Arizona are free to place a different interpretation on Article XXVIII and thereby render it constitutional. That is, there is no dispute that the Arizona courts are the definitive expositors of Arizona state law. However, Yniguez' argument goes one step further. She contends in her brief that even assuming that the district court correctly understood the meaning of Article XXVIII, its decision that Article XXVIII is unconstitutional as a matter of federal law has no *stare decisis* effect in the Arizona state courts.[7] The district court also took this narrow view of the effect of its decision. *See supra*, p. 730 & n. 1. AOE and Park contend that the view advanced by Yniguez in her brief, and accepted by the district court, overstates the power of state courts to ignore decisions of the lower federal courts.

The view that decisions of the lower federal courts on questions of federal law do not bind the state courts has gained considerable acceptance in the academic literature.[8] It has also been expressed by some state courts, although others have expressed the opposite view.[9] And while the

Supreme Court has never squarely faced the question, several individual justices have stated that principles of federalism require that the state courts be treated as coordinate and coequal with the lower federal courts on matters of federal law.[10]

Despite the authorities that take the view that the state courts are free to ignore decisions of the lower federal courts on federal questions, we have serious doubts as to the wisdom of this view. Having chosen to create the lower federal courts, Congress may have intended that just as state courts have the final word on questions of state law, the federal courts ought to have the final word on questions of federal law. The contrary view could lead to considerable friction between the state and federal courts as well as duplicative litigation. Furthermore, the sparse authority on the subject appears to be concerned largely with the *stare decisis* effect of federal *district* court decisions on subsequent state court actions, rather than the effect of decisions of the federal courts of appeals; there may be valid reasons not to bind the state courts to a decision of a single federal district judge—which is not even binding on the same judge in a subse-

---

**7.** At the oral argument, Yniguez appeared to retreat from her categorical view. In any event, we note that there is considerable irony in the position Yniguez took on this issue in her brief. We may assume that she brought her suit in the hope of obtaining a broad declaration that Article XXVIII is unconstitutional on its face and therefore may not be applied constitutionally to anyone. That is, after all, precisely what the district court held. Having prevailed in the district court Yniguez argued in her brief that we should declare that all she really won is an extremely narrow ruling that Article XXVIII cannot be constitutionally applied to her by the state, the Governor, or the Attorney General, but that private parties are free to enforce it against her, and both official and private parties may enforce it against anyone else.

**8.** *See, e.g.,* Meltzer, *State Court Forfeitures of Federal Rights,* 99 Harv.L.Rev. 1130, 1231 n. 495 (1986); Shapiro, *State Courts and Federal Declaratory Judgments,* 74 Nw.U.L.Rev. 759, 771 (1979); Cover and Aleinikoff, *Dialectical Federalism: Habeas Corpus and the Court,* 86 Yale L.J. 1035, 1053 (1977).

**9.** *Compare Bradshaw v. State,* 286 So.2d 4, 6 (Fla.1973), *cert. denied,* 417 U.S. 919, 94 S.Ct.

2626, 41 L.Ed.2d 225 (1974) ("It is axiomatic that a decision of a federal trial court, while persuasive if well-reasoned, is not by any means binding on the courts of a State"); *State v. Coleman,* 46 N.J. 16, 35–38, 214 A.2d 393, 403–05 (1965), *cert. denied,* 383 U.S. 950, 86 S.Ct. 1210, 16 L.Ed.2d 212 (1966); *Iowa Nat'l Bank v. Stewart,* 214 Iowa 1229, 232 N.W. 445, 454 (1930), *with Handy v. Goodyear Tire & Rubber Co.,* 230 Ala. 211, 160 So. 530 (1935); *Kuchenmeister v. Los Angeles & S.L.R.,* 52 Utah 116, 172 P. 725 (1918).

**10.** *See Steffel v. Thompson,* 415 U.S. 452, 482 n. 3, 94 S.Ct. 1209, 1227 n. 3, 39 L.Ed.2d 505 (1974) (Rehnquist, J., joined by Burger, C.J., concurring); *Perez v. Ledesma,* 401 U.S. 82, 125, 91 S.Ct. 674, 697, 27 L.Ed.2d 701 (1971) (Brennan, J., joined by White and Marshall, JJ., dissenting) (referring only to "the persuasive force" of a decision of a lower federal court on state courts). *See also Lawrence v. Woods,* 432 F.2d 1072, 1075 (7th Cir.), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1658, 29 L.Ed.2d 148 (1970) (holding that federal district court's decision on question of federal law was not a binding precedent for the Illinois courts).

quent action—that are inapplicable to decisions of the federal courts of appeals. Finally, if decisions of the federal courts of appeals invalidating state laws carry no authority, it would be difficult to comprehend why for so many years a right of appeal to the Supreme Court was provided in all cases in which federal circuit courts held state statutes unconstitutional. *See* 28 U.S.C.A. § 1254(2) (West 1979).[11] In any event, we may assume without deciding that an unappealed judgment of the district court would have no precedential weight in the Arizona courts, for even under this assumption, we find that the interests of AOE and Park are practically impaired by the decision.

There is no dispute that the declaration that Article XXVIII is facially invalid binds Governor Mofford and her successors in any actions against Ms. Yniguez. This fact alone suggests that the interests of AOE and Park have been practically impaired. Moreover, there is at least some uncertainty as to whether it would also bind the Governor of Arizona in enforcement suits against defendants other than Ms. Yniguez. *Compare H.L. v. Matheson,* 450 U.S. 398, 406, 101 S.Ct. 1164, 1169, 67 L.Ed.2d 388 (1981) (stating categorically that an unappealed ruling of a federal district court is binding on a state party), *with United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984) (holding that non-mutual offensive collateral estoppel may not be applied against the federal government). As a result, Arizona's Governor may hesitate to take any steps to implement Article XXVIII. Indeed, the Attorney General has represented to this court that in light of the district court's decision, he believes that any enforcement of Article XXVIII would be of questionable legality, and we cannot fault him for his willingness to abide by a federal court's declaration that the provision is unconstitutional. Yet Article XXVIII places an af-

firmative duty on that official to "take all reasonable steps to preserve, protect and enhance the role of English as the state's official language." The district court's decision casts a cloud over the state's power to enforce Article XXVIII. While it may have left AOE's and Park's right to sue intact, a right to bring a private enforcement action is not a complete substitute for executive enforcement and implementation. Hence, as a practical matter, the district court's ruling substantially weakened Article XXVIII, and thereby impaired the interest of AOE and Park.

Furthermore, even if we assume that the district court's ruling has *no* binding effect on the Arizona courts, we cannot wholly overlook the fact that jurisprudential concerns might cause those courts to find the reasoning of the district court more persuasive than they might otherwise find a similar argument to be, and that they might choose to accept the district court's reasoning to avoid confusion, lack of finality, and disrespect for law. *See Commonwealth v. Negri,* 419 Pa. 117, 121–22, 213 A.2d 670, 672 (1965). In any event, the district court's opinion will have impaired AOE's and Park's interests in the vitality of Article XXVIII.

### 4. Inadequacy of Representation by Other Parties

Having decided not to appeal the district court's decision on the merits, the Governor inadequately represents the interests of AOE and Park. Moreover, as we hold below, the Attorney General is estopped from re-entering this litigation as a party. *See infra,* p. 738. Thus, absent an appeal by AOE and Park, no party will be able to assert Article XXVIII's constitutionality. Because no representation constitutes inadequate representation, the fourth *Sagebrush Rebellion* criterion is met.

---

**11.** Congress eliminated the provision for such appeals in 1988. *See* Supreme Court Case Selections Act, Pub.L. 100–352 (1988); 28 U.S.C.A. § 1254(2) (West Supp.1990). However, the repeal was not the result of a determination by Congress that decisions of the federal courts of appeals invalidating state laws are without bind-

ing force. Rather, it was part of an Act eliminating nearly all of the Supreme Court's mandatory jurisdiction in response to the Court's unanimous request that Congress make its jurisdiction discretionary whenever possible. H.R.Rep. No. 100–660, 100th Cong., 2d Sess., 2, *reprinted in* 1988 U.S.Code Cong. & Admin.News 766, 767.

Furthermore, even if the government were a party to this appeal, that would not ensure adequate representation of the interests of AOE and Park. The Attorney General has issued an opinion narrowly construing Article XXVIII. In his view, the English-only requirement applies solely to official acts of the Arizona government, and does not prohibit the use of languages other than English by state personnel such as Yniguez. The district court rejected the Attorney General's proffered construction because it is not binding on the Arizona courts and because, in the view of the district court, it contradicts the plain language of Article XXVIII. By contrast with the Attorney General, AOE and Park agree with the district court that Article XXVIII should be construed broadly, although they disagree with the court that the provision so construed is unconstitutional. In any event, at this stage in the proceedings it is clear that the Attorney General would not represent the views of AOE and Park adequately.

## II. The Attorney General's Intervention Motion

Attorney General Corbin claims a right to intervene under Fed.R.Civ.P. 24(a) and 28 U.S.C. § 2403. Because we hold that there is an Article III "case or controversy" between Yniguez (on the one hand) and AOE and Park (on the other), we need not address the question whether the Attorney General would have standing to appeal under Article III if no other party were willing and able to appeal. Thus, we turn directly to his claims under Rule 24(a) and section 2403.

### A. *Rule 24(a)*

We note initially that the Attorney General did not contend in the district court that his putative right to intervene was located in Rule 24(a). The sole basis for his intervention motion in the court below was section 2403. Thus, we have serious doubts whether his claim under Rule 24(a) is properly before us. Even if it is, however, we find that having argued in the district court that he should not be a party,

the Attorney General is estopped from now arguing that he should be.

As we explained in *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990), " '[t]he doctrine of judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process.' " (Quoting *Religious Technology Center v. Scott*, 869 F.2d 1306, 1311 (9th Cir.1989) (Hall, J., dissenting)). Although " 'most commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or a prior one,' " *id.*, it applies more generally as well. In *Russell*, for example, we applied the discretionary estoppel doctrine to preclude inconsistent *legal* assertions.

This case is ideally suited for the application of judicial estoppel. From the fact that we have estopped litigants from asserting mere *arguments* that are inconsistent with arguments on which they prevailed in the district court, it follows *a fortiori* that we will not allow a party to seek an *outcome* directly contrary to the result he sought and obtained in the district court. Yet that is precisely what the Attorney General is attempting to do here. The Attorney General represented to the district court that he did not wish to be a party to this litigation, presented arguments in support of that position, and persuaded the district court to rule in his favor on that point. Only after the district court granted the Attorney General's request and then reached a result on the merits with which the Attorney General disagreed did that official decide that he would rather be a party after all. We will not accept such a reversal in position.

Nor is the Attorney General's about-face excused by the Governor's decision not to appeal. Governor Mofford's position on Article XXVIII was well known at the outset of this litigation. Nonetheless, the Attorney General presented separate arguments to the district court in support of

dismissing the case against each individual defendant. The Attorney General should have realized that the district court might accept some but not all of these arguments, and should have made his tactical decisions accordingly.

Finally, the Attorney General argues that he is entitled to intervene as a party because no prejudice to Yniguez would result from his intervention. Were we to hold that AOE and Park could not intervene this argument would surely be incorrect. In such circumstance, allowing the Attorney General to intervene would mean that there would be an appeal of an otherwise unappealable judgment in Yniguez' favor. Certainly this would prejudice Yniguez. Moreover, even in light of our decision that AOE and Park may appeal, the Attorney General's prejudice argument misses the point. The principal concern of the doctrine of judicial estoppel is the integrity of the judicial process. The district court expended valuable judicial resources evaluating and granting the Attorney General's request that he be dismissed from the suit. We will not render that expenditure for naught simply because subsequent circumstances, all of which were foreseeable, caused the Attorney General to change his mind.

### B. *Section 2403(b)*

■ 28 U.S.C. § 2403(b) provides:

> In any action, suit or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall ... permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality.

The district court held that the instant case is not an action to which an officer of the state is not a party because the Governor is a party, albeit one who has not chosen to appeal. We consider this an overly narrow reading of the statute. Section 2403(b) entitles the Attorney General to make an argument in a "proceeding" to which no representative of the state is a party. Having failed to file a notice of appeal, and having accepted the district court's decision on the merits, the Governor cannot realistically be considered a party to an appeal by AOE and Park. The Governor is no longer in any sense a participant. Moreover, whether or not the Governor technically remains a party, the simple fact is that unless we allow the Attorney General to make his argument we will have to pass judgment on the constitutionality of a provision of Arizona law without hearing the views of the state of Arizona. That result would be contrary to both the letter and the spirit of section 2403(b).

From the face of section 2403(b) it is apparent that the Attorney General may intervene on appeal, but only to the extent that the section permits. The statute confers a right to intervene in any "court of the United States," a phrase which includes a circuit court of appeals. *See Wallach v. Lieberman*, 366 F.2d 254, 258 n. 9 (2d Cir.1966) (noting that intervention under section 2403(b) is appropriate at any stage of the proceedings) (citing *Glidden Co. v. Zdanok*, 368 U.S. 814, 82 S.Ct. 56, 7 L.Ed.2d 22 (1961)). However, contrary to the Attorney General's contention, section 2403(b) confers only a *limited* right upon him. Under that section, the Attorney General is permitted to make an argument on the question of constitutionality, but he is given no right to appeal *as a party*. Before the Attorney General can assert any right at all there must be a viable proceeding in which that right may be asserted. It is only because we hold that AOE and Park may appeal that we conclude that there is such a proceeding and that the Attorney General may, therefore, pursuant to section 2403(b), make an argument regarding constitutionality.[12]

12. It is worth mentioning that Yniguez' attorney stated during oral argument that if we were to hold that AOE and Park have a right to appeal, he would not object to the Attorney General's participation in the appeal as well. However, our decision that the Attorney General has a right to intervene under section 2403(b) does not depend on this concession.

Finally, we note that there is no inconsistency between our determination that the Attorney General may make an argument about the constitutionality of Article XXVIII and our decision that he is estopped from claiming a right to appeal as a party. We emphasize that under section 2403(b) the Attorney General is not a party. His right to argue the constitutionality of Article XXVIII is contingent upon AOE and Park's bringing the appeal at issue. So long as there is such an appeal he may file a brief and participate in the oral argument, but having asked the district court to dismiss him as a party, he cannot now become one again. Should AOE and Park cease to be parties to this action for any reason, the Attorney General will have no right to complain.[13]

## CONCLUSION

The district court's denial of the intervention motion of AOE and Park is reversed. The district court's denial of the Attorney General's intervention motion is affirmed insofar as the Attorney General sought to be designated a party to this appeal and reversed insofar as he seeks to make an argument as to the constitutionality of Article XXVIII pursuant to 28 U.S.C. § 2403(b). We shall retain jurisdiction over the appeal of the district court's decision on the merits.[14]

AFFIRMED IN PART AND REVERSED IN PART.

---

**13.** As we have noted, the Attorney General has taken a somewhat narrower view of the effect of Article XXVIII than the view taken by AOE. In pursuing the question of constitutionality the Attorney General will necessarily argue questions of interpretation of the state provision at issue. Our holding that section 2403(b) should be narrowly construed with respect to the Attorney General's status should not be taken as an indication that we would similarly limit the scope of his argument. To the contrary, we think the court will benefit from receiving the widest range of views on the important issues presented in this case, including the proper meaning of Article XXVIII.

**14.** Yniguez has requested attorneys' fees under 42 U.S.C. § 1988. Because we have not yet heard the appeal on the merits we do not know whether she is a prevailing party entitled to attorneys' fees. We will decide that question after we decide the merits.